Approved: *Kimberly J. Ravener*
         KIMBERLY J. RAVENER
         Assistant United States Attorney

Before:  HONORABLE JAMES C. FRANCIS IV
         United States Magistrate Judge
         Southern District of New York

**17 MAG 7025**

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA    :   **SEALED COMPLAINT**

         - v. -           :   Violation of
                            18 U.S.C. § 1349

ABRAHAM KAHAN,         :   COUNTY OF OFFENSE:
                            NEW YORK

         Defendant.   :

- - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

     BRIAN COMISKY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE

### (Conspiracy to Commit Bank Fraud)

     1.   From at least in or about September 2009 up to and including in or about July 2011, in the Southern District of New York and elsewhere, ABRAHAM KAHAN, the defendant, and others known and unknown, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud in violation of Title 18, United States Code, Section 1344, to wit, KAHAN agreed with others to make misrepresentations to Park Avenue Bank (the "Bank") in order to secure a $1.4 million loan from the Bank (the "Loan").

     2.   It was a part and an object of the conspiracy that ABRAHAM KAHAN, the defendant, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud financial institutions, to wit, the Bank, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by,

and under the custody and control of, such financial
institutions, by means of false and fraudulent pretenses,
representations, and promises, in violation of Title 18, United
States Code, Section 1344.

(Title 18, United States Code, Sections 1349 and 3293.)

COUNT TWO

(Conspiracy to Make False Statements to a Financial Institution)

3.     From at least in or about September 2009 up to
and including in or about July 2011, in the Southern District of
New York and elsewhere, ABRAHAM KAHAN, the defendant, and others
known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with another to
commit an offense against the United States, to wit, making
false statements to a bank in violation of Title 18, United
States Code, Section 1014, to wit, for the purpose of obtaining
the Loan, KAHAN agreed to misrepresent to the Bank, among other
things, the actual borrower, the actual purpose of the Loan, and
the actual assets of the purported borrower (the "Straw
Borrower").

4.     It was a part and an object of the conspiracy
that ABRAHAM KAHAN, the defendant, knowingly made a false
statement or report or willfully overvalued land, property, or
security for the purpose of influencing the action of the Bank,
an institution the accounts of which are insured by the Federal
Deposit Insurance Corporation, in connection with an
application, advance, discount, purchase, purchase agreement,
repurchase agreement, commitment, or loan.

OVERT ACTS

5.     In furtherance of the conspiracy and to effect
the illegal object thereof, the following overt acts were
committed in the Southern District of New York and elsewhere:

a.     On or about June 5, 2009, ABRAHAM KAHAN, the
defendant, arranged for the conveyance of a property located on
57th Street in Brooklyn, New York (the "57th Street Property")
held in the name of KAHAN's wife for purported consideration of
$10 to the Straw Borrower.

2

b.    On or about August 31, 2009, a co-conspirator not charged herein ("CC-1") emailed a net worth statement for the Straw Borrower in support of the Loan to a Bank employee, which listed the 57th Street Property as an asset belonging to the Straw Borrower with a value of approximately $2.5 million.

c.    On or about August 31, 2009, CC-1 sent an email to a Bank employee, which falsely stated the intended use of the Loan proceeds.

(Title 18, United States Code, Sections 371 and 3293.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

6.    I am a Special Agent with the FBI and have been so employed for approximately six years.  Within the FBI, I am assigned to the Financial Institutions Fraud squad.  In my current position, I investigate violations of federal criminal laws affecting banks and financial institutions, including violations of Title 18, United States Code, Sections 1344 and 1349.

7.    I have been personally involved in the investigation of this matter.  This Affidavit is based upon my personal participation in the investigation, my review of law enforcement records, and my conversations with other law enforcement agents.  Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview of the Fraud

8.    In or around 2009, ABRAHAM KAHAN, the defendant, sought to obtain an approximately $1.4 million Loan from the Bank in order to finance KAHAN's investment in a business opportunity with another individual ("CC-2").  However, knowing that KAHAN would not qualify for the Loan from the Bank, KAHAN recruited the Straw Borrower to assist in obtaining the Loan. To effectuate the scheme, KAHAN and CC-2 partnered with CC-1, a

director at the Bank, who could help shepherd the fraudulent
Loan application through the bank's approval process and guard
it from scrutiny.  Together, KAHAN, CC-1, and CC-2 concocted a
false premise for the Loan, supported the Loan application with
false representations, and set up pass-through bank accounts to
funnel the $1.4 million in Loan proceeds to themselves.

<u>KAHAN Seeks Assistance in Obtaining a Bank Loan</u>

        9.    Based on my participation in interviews with the
Straw Buyer who is a cooperating witness in this investigation
("CW-1"),[1] my review of reports of interviews of CW-1 drafted by
other law enforcement agents, and my review of a sworn statement
by CW-1 taken by the Federal Deposit Insurance Corporation
("FDIC") on or about August 6, 2013, I have learned the
following, in substance and in part:

        a.    In or around the spring or summer of 2009,
ABRAHAM KAHAN, the defendant, approached CW-1 in the hopes of
seeking financial assistance from CW-1.

        b.    KAHAN claimed to CW-1 that KAHAN was
experiencing financial difficulties, and that KAHAN needed funds
to invest in a home health care business ("Business-1") to
restore his finances.

        c.    KAHAN explained that he had an opportunity
to obtain a loan from the Bank to fund this investment in
Business-1.[2]

        d.    However, KAHAN also indicated to CW-1 that
KAHAN was experiencing a temporary tax problem that had impaired
his ability to obtain the Loan in his own name.  KAHAN sought
CW-1's assistance to obtain the Loan on KAHAN's behalf.

        e.    CW-1 entrusted KAHAN to handle

_____

[1] In exchange for his assistance to law enforcement in this
investigation, the Government has agreed to not prosecute CW-1
for his role in the conduct set forth in this Complaint.  CW-1's
information has been corroborated by, among other things, bank
records demonstrating the flow of funds from the Loan and
statements made by other individuals involved in this matter to
the FDIC.
[2] At all times between in or about 2009 up to and including in or
about 2010, the Bank, the deposits of which were insured by the
FDIC, was headquartered in New York, New York and was a New York
State chartered bank regulated by the FDIC.

communications with the Bank in order to arrange the Loan.

        f.   At KAHAN's initiative, on or about June 5, 2009, CW-1 was added to the deed to the 57th Street Property held in the name of KAHAN's wife for purported consideration of $10.

The Straw Loan Scheme

        10.  Based on my review of bank records, including email correspondence and associated documents, and conversations with other law enforcement agents who have reviewed the same, I have learned the following, in substance and in part:

        a. On or about August 31, 2009, two months after becoming, in effect, part owners of the 57th Street Property for a purported consideration of $10, CW-1 and CW-1's spouse, functioning as the Straw Borrower, applied for an approximately $1.4 million unsecured line of credit (the above-referenced "Loan") from the Bank.

        b.  The same day, on or about August 31, 2009, CC-1 emailed a net worth statement for CW-1 (the "Net Worth Statement") to an employee at the Bank ("Employee-1").  The Net Worth Statement falsely included the 57th Street Property as an asset belonging to CW-1 with a value of approximately $2.5 million.

        c.  Later that day, Employee-1 emailed CC-1, inquiring, in substance and in part, "what should I put down as the purpose of the loan?"  CC-1 replied: "To be able to take advantage of business opportunities?"

        d. The Bank's internal review of the Loan was summarized in an internal and contemporaneous Bank document (the "Internal Review"), which stated that, among other things, the purpose of the loan was "[t]o be used for working capital for business investments."

        e. The Internal Review falsely identified CW-1's primary business ("Company-A"), and incorrectly noted that CW-1 "stated that he needs funds to make additional investments, such as down payments on properties, etc. The flexibility of a line of credit will make these investments possible."  The Internal Review further falsely listed CW-1 as a "client" of CC-1, a Bank board member.

5

f. ABRAHAN KAHAN, the defendant, was not mentioned anywhere in the Loan application or the Internal Review.  Nor did the Loan application contain any mention of Business-1, the company KAHAN sought to invest in.  The sole signatories for the Loan were CW-1 and CW-1's spouse.

g. The Bank approved the Loan on or about September 15, 2009.

### The Defendant's Use of the Fraud Proceeds

12.   Based on my review of bank records, including email correspondence and associated documents, corporate records, and conversations with other law enforcement agents who have reviewed the same, I have learned the following, in substance and in part:

a. On or about September 18, 2009, the Bank funded the Loan, and deposited approximately $1.4 million into a Bank account held in CW-1's name.

b. Proceeds from the loan were quickly distributed into bank accounts controlled by third parties, specifically ABRAHAN KAHAN, the defendant, as well as CC-1 and CC-2.  For example:

i. On or about September 16, 2009, a checking account funded with $100 was opened in CW-1's name at the Bank (the "Disbursement Account").

ii. The same day, two accounts were opened at the Bank in CC-2's name, each of which was funded with $150 (the "CC-2 Accounts").

iii. On or about September 18, 2009, the Bank funded the Loan by providing approximately $1.4 million into the Disbursement Account.

iv. Immediately after the Loan's disbursement, $466,000 was transferred from the Disbursement Account to one of the CC-2 Accounts.

v. The same day, CC-2 transferred $466,000 to a bank account at another bank held in the name of "One World United," a company incorporated by CC-1, registered to CC-1's

6

business address, and from which CC-1 regularly received disbursements.

vi. Several days later, on or about September 25, 2009, an additional $300,000 was transferred from the Disbursement Account to one of the CC-2 Accounts.

vii. On or about October 29, 2009, another $70,000 was transferred from the Disbursement Account to one of the CC-2 Accounts.

viii. On or about November 19, 2009, another $30,000 was transferred from the Disbursement Account to another Bank account held in the name of "Ads Here," over which KAHAN exercised control and signatory authority (the "KAHAN Ads Here Account").

ix. On or about December 1, 2009, an additional $475,000 was transferred to the KAHAN Ads Here Account from the Disbursement Account.

x. On or about December 2, 2009, a transfer of $450,000 was made from the KAHAN Ads Here Account to one of the CC-2 Accounts.

xi. Between on or about December 2, 2009 and on or about December 8, 2009, transfers totaling approximately $445,000 were made from the CC-2 Accounts to an account held at another bank in the name of CC-1's law firm.

### The Termination of the Loan

13. Based on my review of bank records, including email correspondence and associated documents, FDIC records, and conversations with other law enforcement agents who have reviewed the same, I have learned the following, in substance and in part:

a. On or about February 17, 2010, the deed to the 57th Street Property was transferred back to KAHAN and KAHAN's wife from CW-1 for consideration of $10.

b. On or about March 12, 2010, New York State revoked the charter of, and closed the Bank, and the FDIC was appointed as the receiver for the Bank. The Loan and other Bank

obligations were assumed by a successor financial institution ("Bank-2").

c. By in or around October 2010, the Loan fell into default. The Loan was never fully repaid. As a result, Bank-2 and the FDIC, as receiver, suffered a combined loss of approximately $1,066,853.  Bank-2 charged the FDIC-as-receiver approximately $853,482.71 for its loss on the Loan.

### The Loan Participants' Statements about the Loan

14.  Based on my participation in interviews with CW-1, my review of reports of interviews with CW-1 drafted by other law enforcement agents, and my review of a sworn statement by CW-1 taken by the FDIC on or about August 6, 2013, I have learned that since the default of the Loan, CW-1 has stated, in substance and in part, that:

a. CW-1 did not take out the Loan to serve his business needs, but rather signed for the Loan solely in order to assist an acquaintance, ABRAHAM KAHAN, the defendant.

b. CW-1 had no intention of investing in Business-1.

c. CW-1 believed that he was co-signing on the Loan, alongside KAHAN, in order to assist KAHAN's application for the Loan.

d. CW-1 did not know CC-1, and was not CC-1's "client" at the time of the Loan.

e. CW-1 understood that KAHAN interacted with the Bank to secure the Loan, and only briefly visited the Bank in order to sign the Loan documents.

f. CW-1 never met CC-2.

g. CW-1 never used any proceeds from the Loan for CW-1's own personal or business purposes.

15.  Based on my review of a sworn statement by ABRAHAM KAHAN, the defendant, taken by the FDIC on or about October 24, 2013, I know that KAHAN stated to the FDIC, in substance and in part, that:

8

a.     KAHAN engaged CC-1 as counsel to advise KAHAN on KAHAN's ability to participate in the home care industry following KAHAN's conviction in or about 2006 for federal health care fraud.

b.     KAHAN invested approximately $900,000 in Business-1.  KAHAN refused to explain at his FDIC testimony the source of these funds.

c.     KAHAN's handwriting was reflected on various checks from bank accounts held in the name of CW-1 and CC-2.

WHEREFORE, deponent prays that an arrest warrant for ABRAHAM KAHAN, the defendant, be issued and that KAHAN be arrested and imprisoned, or bailed, as the case may be.

BRIAN COMISKY
Special Agent
Federal Bureau of Investigation

Sworn to before me this
21st day of September, 2017

HONORABLE JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK